IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


CHRYSTAL GRAY                                                                          PLAINTIFF


v.                                          No. 4:04CV00490 GH


ARKANSAS DEPARTMENT OF
HUMAN SERVICES, ET AL.                                                       DEFENDANTS


## ORDER

By order filed last March 28th, the Court denied defendants' motion to strike Dorothy

Bollen's affidavit, permitted defendants to take Bollen's deposition, and granted them 20 days after

the completion of that deposition to supplement their reply and response to plaintiff's Local Rule

56.1 statement.  Nothing has been filed since that order.  Thus, the Court now rules on defendants'

motion for summary judgment.

Plaintiff, who brings suit pursuant to Title VII, and 42 U.S.C. §§1981 and 1983, alleges that

Sherry Anderson, who was hired in 2001 as Director of the Division of Volunteerism ("DOV")

where plaintiff worked as a Volunteer Program Developer, soon thereafter began to subject plaintiff

and other black employees to discriminatory conduct; the black employees made complaints to their

immediate supervisor, Selena Ellis, then Deputy Director R. T. Williams and to Anderson; and their

complaints resulted in Anderson firing two employees and retaliation against plaintiff.  She

continues that Anderson loaned plaintiff to the Transitional Employment Board ("TEA") on April

3, 2003 without discussion, agreement and across departmental lines which she believes to be in

violation of policy; that plaintiff was informed on July 29, 2003, that a complaint had been made

against her by a faith-based entity and she was sent home for 30 days pending a review; on August 29, 2003, she was informed that she would receive a ten day suspension without pay and six disciplinary points; however, she was successful in grieving the disciplinary action and having it reversed with all negative information removed from her personnel file; these actions were discriminatory and retaliatory as Anderson failed to outline the exact complaints lodged against her and failed to appear at the August 27, 2003 meeting of the parties, has afforded Caucasians the full scope of the formal hearing process, and Anderson and Ellis could have done a better job of investigating the allegations to have ended it at the investigatory stage. Plaintiff also asserts that she was loaned while she was suspended to the Office of Appeals and Hearings ("OAH") as an Administrative Law Judge for which she is not legally trained nor has the experience so it is an attempt to set her up for failure thereby causing her termination and that the loaning of her to TEA and OAH prior to her performance evaluation caused her to be ineligible to receive her CLIP bonus.

Defendants have moved for summary judgment supported by brief, exhibits, and a separate statement of undisputed facts. They state that plaintiff raises one claim of disparate treatment based upon race – the discipline imposed in August of 2003 – and that she cannot present a prima facie case of race discrimination as she cannot show that similarly situated employees outside her protected class were treated differently, that she did not raise any other claims to the EEOC including any claims of retaliation, that she cannot rebut the DOV's legitimate non-discriminatory reason for disciplining her from the complaints and investigation stemming from her work at Promise Land Church ("PLC"), that the individual defendants are not employers for purposes of Title VII, and that governmental agencies are exempt from judgments for punitive damages. Defendants continue that plaintiff's §1983 claims against DHS and the individual defendants in their

official capacities are barred by the Eleventh Amendment as she does not seek prospective injunctive relief in her complaint and the claims brought against them in their individual capacities should be analyzed using the Title VII standards and denied.

They contend that plaintiff's §1983 race claim involving her August 2003 discipline fails as she cannot present evidence of a similarly situated white person receiving dissimilar treatment under similar circumstances and that she cannot rebut the legitimate, non-discriminatory reason for imposing discipline upon her. Regarding the TEA loan and her §1983 claim of denial of equal protection, defendants argue that plaintiff cannot show that she suffered an adverse job employment action as she received the same pay and benefits at DOV, she admitted that two supervisors could swap or move an employee across departmental or agency lines as she confirmed her previous loan in the early 1990s for a project that lasted nearly a year, a white employee was treated exactly as plaintiff was when Linda Hollaway was loaned from TEA to DOV by her supervisor, and plaintiff cannot rebut the reason that plaintiff was loaned was because Sandra Winston needed an employee with strong networking skills. Turning to the OAH loan, defendants state that the same analysis applies that plaintiff cannot show an adverse job action or dissimilar treatment to establish a prima facie case and cannot rebut that plaintiff was loaned to OAH because Toni White needed a hearing officer for child maltreatment cases and plaintiff had worked in that arena in the past.

Defendants next address the claim that plaintiff did not receive a CLIP bonus in April of 2004. They state that plaintiff did not receive a yearly CLIP bonus in 2001, 2002 or 2003 even though a different supervisor reviewed her for each time period; that she was loaned to OAH in September of 2003 and David Mackey at OAH completed her performance review where plaintiff marked the box indicating that she had reviewed its contents with her supervisor and agreed with

-3-

it; that she did not suffer an adverse employment action because of her satisfactory "3" rating; that she cannot present evidence of a similarly situated white person receiving dissimilar treatment under similar circumstances; and that plaintiff cannot rebut that her performance was not high enough to warrant the bonus just as her performance had not been high enough for the bonus in 2002 or 2003.

Regarding plaintiff's §1983 retaliation claim, defendants rely on plaintiff's deposition testimony that she did not think her loan to OAH was retaliation but just continued racism; that plaintiff was loaned on September 2, 2003 before she informed anyone at DOV on September 7th that she planned to grieve her discipline so there is no causal connection and no adverse action and plaintiff cannot rebut that White needed an employee to work as a child maltreatment hearing officer.

Briefly, defendants argue that the grievance procedure did not create a protected property interest and plaintiff admits that the grievance officer did everything correctly; that they are entitled to qualified immunity as there is no evidence that any of the individual defendants discriminated against plaintiff; and that §1983 is the exclusive remedy for §1981 violations.

Supported by brief, exhibits, and controverting statement and supplemental statement, plaintiff has responded that this case is really about a racially motivated management style. She states that there is a practice within DHS and other state and federal agencies of loaning employees, but the policy and practice is not written and the criteria for these loans are purely subjective. Plaintiff asserts that not one single Caucasian person has ever been loaned to another agency in the entire history of DOV while she has been loaned out three times – the first in the early 1900's by a supervisor who was not using the procedure to cloak racial animus where she was consulted and took part in planning for the specific position, the second time was being sent with one working day

of warning to TEA where she was given no job description nor any clear ideas of her duties and immediately transferred back to DOV as she was set up to fail when she was disciplined as a result of a complaint from a faith-based group for actions taken while she was at TEA, and the third time was to the OAH while she was grieving the discipline and placed in a position for which she had no background in apparent retaliation for seeking a hearing. She challenges the materials regarding her assignment at PLC arguing that hearsay and double hearsay are used to support that proposition which was not considered competent by DHS's own internal grievance hearing officer. Plaintiff continues that while defendants bemoan that they lacked subpoena power to get PLC officials to the hearing, they could have produced those individuals here or sought statements from them.

Plaintiff asserts that she has direct evidence of racial animus that Anderson treated African Americans with contempt and allowed her immediate subordinate to do so in granting leeway to those of the Caucasian race not being required to attend "mandatory" staff meetings, being allowed to utilize state owned property for personal use while on the job, and being allowed to work from their homes; Anderson – within six months – eliminated every single African American female VPD from her staff and has taken retaliatory action against a white friend and supporter of plaintiff after she confronted Anderson on several occasions regarding Anderson's racial animus toward plaintiff.

She next turns to the indirect framework for a prima facie case of racial discrimination – that she is an African American; she had never suffered disciplinary action; she suffered an adverse action in being transferred twice, suffered a loss in pay where she was not made fully whole due to the tax consequences of the discipline, and she was denied her "CLIP" raise for two years due to lack of time in the position.

Plaintiff does not dispute that the individual employers are not liable under Title VII but do have liability under the other theories pled. She also agrees that only the discipline imposed in August 2003 is before the Court under a Title VII analysis. She continues that the evidence from the Harden deposition is that African Americans were disciplined more swiftly and reliably for violations of policy and that plaintiff herself points to one of the things leading to her transfer was her arrival late for a group where she was suppose to speak and Linda Jocelyn was late to another event and not taken to task. Plaintiff states that other employees were warned against associating with plaintiff as she was trouble. She asserts that the individual defendants have liability including punitive damages by their animus in the treatment of Bollen as a supporter of plaintiff and threatened to transfer Bollen to the TEA as an adverse action.

Turning to the §1983 claims, plaintiff states that she has asked for injunctive relief which is permitted under the 11th Amendment. She contends that defendants cannot avail themselves of qualified immunity as the law on intentional discrimination has been well established since 1964. Plaintiff also argues that the 1991 amendments overruled Jett as to whether §1981 is applicable.

Defendants filed a reply supported by deposition excerpts and supplemental affidavits. They counter that while plaintiff asserts that no Caucasian has ever been loaned to another agency, Anderson has indicated that Caucasians were loaned to other agencies; that plaintiff was loaned only twice under Anderson's tenure and the first loan did not occur until three years after that tenure began; plaintiff has submitted no proof as to what was routinely done in loaning especially as she had been loaned once ten years before Anderson's arrival and contradicts her claim that no Caucasian was loaned; plaintiff's contention that Winston would not give a job description despite plaintiff's plea is not supported by Winston, an African American female; plaintiff's loan agreement

to TEA began April 7th and was extended – as was Hollaway's – in early June for six more months until Winston cancelled the loan in mid-July due to complaints from PLC; plaintiff did not receive a CLIP bonus in 2001 when her supervisor was Les Brunson, in 2002 when her supervisor was Selena Ellis and 2003 when her supervisor was Toni White although she received a CLIP bonus for 2004 under the supervision of White demonstrating that she was able to handle her new hearing position and received her first merit bonus in four years; there is no evidence that PLC refused to participate in the grievance hearing; the documents relied upon by defendants are not inadmissible hearsay and may be used to explain the employer's conduct to show state of mind and are part of the personnel file too; plaintiff stated in her deposition that she did not believe that her loan to OAH was based on retaliation but race; plaintiff, not defendants, should have taken the depositions of the third-party witnesses to rebut that PLC did not complain or that Ellis, Anderson and Winston lied about their investigation; and Ellis and Frank conducted the investigation and Ellis disciplined plaintiff based on that investigation.

Defendants continue that plaintiff has not submitted proof of direct evidence of racial animus and her reference to testimony of herself, Harden, Bollen, Rhodes and Thomas was without citation to any page, no quote or no explanation and plaintiff herself said those four individuals knew nothing about the case as none of them were involved. They assert that there is no proof to support that more leeway was given to Caucasians or that Anderson eliminated every single African American female VPD from her staff within six months of her arrival. Defendants note that there was no finding by the grievance officer that the discipline imposed was "improper or unfounded" as he stated that the recall of plaintiff from the assignment was "appropriate and reasonable action;" there is no proof that Harden was disciplined more swiftly than whites as Harden was disciplined

by her African American supervisor Sweeney after Harden threatened an employee at her work place at the State library; plaintiff has failed to indicate that a similarly situated white employee was disciplined differently than she was as the Linda Fitts issue was not involved in plaintiff's discipline here and it is conclusory that Linda Jocelyn is similarly situated.

Defendants point out that plaintiff does not contend that punitive damages are awardable under Title VII against the state and that qualified immunity protects Anderson and Ellis for the §1983 claims. They argue that prospective injunctive relief through official capacity defendants is also unavailable as plaintiff has not alleged or presented any evidence of a specific policy or custom that led to the deprivation of her constitutional rights; plaintiff has failed to provide evidence of a similarly situated employee on any issue raised under §1983 or rebut their legitimate, non-discriminatory reasons for their actions; and she has not supplied any rejoinder to the qualified immunity analysis; the 1991 amendments to §1981 apply to non-governmental discrimination and cites no authority that §1983 is the exclusive remedy for rights guaranteed by §1981 when the claim is against a state actor.

Turning to the McDonnell Douglas analysis, defendants contend that plaintiff has failed to make out a prima facie case in failing the name another similarly situated white employee and has failed to respond – let alone rebut – the legitimate, non-discriminatory reason given by defendants for her discipline.

Summary judgment can properly be entered when there are no genuine material facts that can be resolved by a finder of fact; that is, there are no facts which could reasonably be resolved in favor of either party. The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S.Ct. 2505, 2512 (1986). The non-moving party may not just rest upon his or her pleadings, but must set forth specific facts showing that there is a genuine issue for trial. <u>Celotex Corp. v. Catrett</u>, 106 S.Ct. 2548 (1986); Civil Procedure Rule 56. In <u>Counts v. MK-Ferguson Co.</u>, 862 F.2d 1338, 1339 (8th Cir. 1988), the Eighth Circuit explained:

> [T]he burden on the party moving for summary judgment is only to demonstrate, <u>i.e.</u>, "[to] point[ ] out to the District Court," that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted. (citations omitted) (brackets in original).

"The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather the dispute must be outcome determinative under prevailing law." <u>Holloway v. Pigman</u>, 884 F.2d 365, 366 (8th Cir. 1989).

Defendants are correct in their argument that §1981 does not provide an independent cause of action for damages against state actors. In <u>Artis v. Francis Howell North Band Booster Ass'n, Inc.</u>, 161 F.3d 1178, 1181 (8th Cir. 1998), the appellate court said:

> A federal action to enforce rights under §1981 against a state actor may only be brought pursuant to §1983. See <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) ( Section 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by §1981 when the claim is pressed against a state actor.").

However, in <u>Lockridge v. Board of Trustees of University of Arkansas</u>, 315 F.3d 1005, 1007 (8th Cir. 2003), the appellate court stated "([b]ecause we have held that a claim alleging a violation of §1981 may not be brought directly against a state actor, but must be brought under §1983, see

<u>Artis v. Francis Howell North Band Booster Ass'n</u>, 161 F.3d 1178, 1181 (8th Cir. 1998), we liberally

construe Mr. Lockridge's complaint as including claims for violations of the equal protection clause

and §1981 brought under §1983.)"

Moreover, the §1983 damage claims against defendants in their official capacities must be

dismissed as explained below by <u>Murphy v. State of Ark.</u>, 127 F.3d 750, 754 (8th Cir. 1997):

> Second, §1983 damage claims against the seven individual defendants acting in their official capacities are likewise barred, either by the Eleventh Amendment or because in these capacities they are not "persons" for § 1983 purposes. See <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

Nevertheless, plaintiff has sought prospective equitable relief by requesting a declaratory judgment

and a permanent injunction. "State officials acting in their official capacities are §1983 'persons'

when sued for prospective relief, and the Eleventh Amendment does not bar such relief. See

<u>Treleven v. University of Minn.</u>, 73 F.3d 816, 819 (8th Cir. 1996)." <u>Id</u>.

Nevertheless, the presence of the §1983 claim does not change the Court's task. See, <u>Evans</u>

<u>v. Kansas City, Mo. School Dist.</u>, 65 F.3d 98, 101 (8th Cir 1995) ("Much of the analysis of a

retaliation claim under section 1981 is similar to that under Title VII.").[1] See also, <u>Bainbridge v.</u>

<u>Loffredo Gardens, Inc.</u>, 378 F.3d 756, 760 (8th Cir. 2004).

---

[1]        A number of courts have held that section 1981 encompasses allegations of retaliatory conduct in the racial discrimination context. <u>Evans v. Kansas City, Mo. School Dist</u>., 65 F.3d 98, 101 (8th Cir. 1995), <u>cert</u>. <u>denied</u>, 517 U.S. 1104, 116 S.Ct. 1319, 134 L.Ed.2d 472 (1996). See also <u>Hawkins v. 1115 Legal Service Care</u>, 163 F.3d 684, 693 (2nd Cir. 1998). See also <u>Patterson v. Augat Wiring Systems, Inc</u>., 944 F.Supp. 1509, 1520 (M.D. Ala. 1996) (discussing cases); <u>Thomas v. Exxon, U.S.A.</u>, 943 F.Supp. 751, 762 (S.D. Tex. 1996), aff'd, 122 F.3d 1067 (5th Cir. 1997) (same).

<u>Fitzgerald v. L&L Truck Brokers, Inc</u>., 32 F.Supp.2d 1080, 1085 (E.D. Ark.1999)

First, although plaintiff asserts that she has produced direct evidence of racial animus, such proof is lacking. The testimony she points to concerns the witnesses' beliefs and opinions as to Anderson's attitudes and whether she was treating blacks and whites differently. The only real statement attributed to Anderson was made during a spring <u>2005</u> mediation of a complaint made by Bollen, a white employee, against Anderson which she felt emanated from her support of plaintiff when Anderson said that plaintiff "practiced voodoo" in the office pointing to a doll that plaintiff had on her desk; Bollen responded that such comments tended to put plaintiff in a bad light and tended to injure her reputation; she also pointed out that she had a necklace which represented African art which someone could describe as voodoo simply because it came from Africa; and Anderson gave Bollen a hostile look and turned her nose up.

However, the appellate court held in <u>Arraleh v. County of Ramsey</u>, 461 F.3d 967, 975 (8th Cir. 2006):

> As for Brady's comment to Arraleh that "black people are expected to leave their blackness behind," Arraleh failed to provide context for this statement and show some link to his not being hired. Without more, no reasonable fact finder could, on the basis of Brady's remark, find that Zurn's hiring decision was racially motivated. At most, the comment is an ambiguous statement by a decisionmaker unrelated to the decisional process. The comment does not constitute direct evidence of discrimination.

Needless to say, the comment at issue was made over 18 months after the last incident complained about by plaintiff and was made to another person during the course of mediation. Hence, the Court cannot find that there is direct evidence of discrimination.

Thus, the Court turns to the case of <u>Twymon v. Wells Fargo & Co.</u>, 462 F.3d 925, 934-935 (8th Cir. 2006), which provides the basic framework to be utilized in determining discrimination allegations as set out below:

We apply the framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to assess Twymon's claim based upon indirect evidence of discrimination. "Under this framework, a Title VII plaintiff has the initial burden of establishing a prima facie case of discrimination." <u>Elmahdi v. Marriott Hotel Servs., Inc.</u>, 339 F.3d 645, 656 (8th Cir. 2003). A plaintiff establishes a prima facie case by showing that: (1) she was a member of a protected class; (2) she was meeting the employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. <u>Philip v. Ford Motor Co.</u>, 413 F.3d 766, 768 (8th Cir. 2005). If a prima facie case is established, a "burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for firing the plaintiff." <u>Johnson v. Ready Mixed Concrete Co.</u>, 424 F.3d 806, 810 (8th Cir. 2005). If the employer makes such a showing, the plaintiff must then demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515-16, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Just last week, the Eighth Circuit Court of Appeals provided the following lengthy, but comprehensive, guide in <u>Higgins v. Gonzales</u>, ____ F.3d _____, 2007 WL 817505, *3-10 (8th Cir. 2007), as to the standards to be used in dealing with both discrimination and retaliation claims:

"Under the <u>McDonnell Douglas</u> framework, a presumption of discrimination is created when the plaintiff meets [her] burden of establishing a prima facie case of employment discrimination. A minimal evidentiary showing will satisfy this burden of production." <u>Davis v. KARK-TV, Inc.</u>, 421 F.3d 699, 704 (8th Cir. 2005). To establish her prima facie case of racial discrimination, Higgins must show: 1) she is a member of a protected class; 2) she met her employer's legitimate expectations; 3) she suffered an adverse employment action; and 4) similarly situated employees who were not members of the protected class were treated differently. <u>Id.</u> The district court found Higgins failed to show she suffered an adverse employment action and thus has not made out a prima facie case under the McDonnell Douglas burden-shifting framework. We agree.

"[An] adverse employment action must be one that produces a material employment disadvantage." <u>Kerns v. Capital Graphics, Inc.</u>, 178 F.3d 1011, 1016-17 (8th Cir. 1999) (internal quotation marks omitted). "Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, as would circumstances amounting to a constructive discharge." <u>Id.</u> (internal citation omitted). Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not satisfy the prong. <u>Baucom v. Holiday Cos.</u>, 428 F.3d 764, 767 (8th Cir. 2005).

In support of her claim of racial discrimination, Higgins alleges several adverse employment actions by Kohn, claiming she: 1) was removed from a primary job duty on the CIRCLE

Project; 2) was denied supervision, mentoring, and training; 3) was subjected to a shadow file and "whisper campaign" about her performance; 4) was formally complained about; 5) was not given an annual or mid-year progress review in 2001; 6) was recommended for termination by Kohn; and 7) was transferred to a different office with an unwilling supervisor. She argues, even if these actions are insufficient when viewed separately, when taken together their cumulative force constitutes an adverse employment action. We will consider each action in turn and thereafter evaluate the cumulative force of those actions.

Higgins first argues her removal from her CIRCLE project duties for a few weeks in early 2000 constitutes an adverse employment action. This court has held, however, a job reassignment involving no corresponding reduction in salary, benefits, or prestige is insufficient to establish an adverse employment action. See, e.g., Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994) (holding job reassignment involving "nothing more disruptive than a mere inconvenience or an alteration of job responsibilities," without any "diminution in ... title, salary, or benefits" is insufficient to establish an adverse employment action). The record shows McBride removed Higgins from her duties on the CIRCLE project for a few weeks in early 2000. He testified he did so because of tribal tensions, and Higgins concedes tribal members were angry with her for reporting misuse of CIRCLE project funds. She does not allege her benefits or pay changed during this period and further admits she took leave to study for the bar exam during this time. During this period she was still responsible for her prosecutorial duties. She is not alleging she was given more or less desirable duties. Like in Harlston, Higgins describes "nothing more disruptive than a mere inconvenience or an alteration of job responsibilities." 37 F.3d at 382. As such, this does not constitute an adverse employment action.

Higgins next claims she was systematically denied supervision, mentoring and training so as to be "set up for failure" as an AUSA. Again, she makes no claim this denial led to a decrease in her pay or benefits or affected her future career prospects, thus this alone cannot constitute an adverse employment action. This alleged denial fails to qualify as an adverse employment action for a more fundamental reason, as she did not ultimately "fail" as evidenced by her new term AUSA position in Pierre. In spite of a few performance complaints, she had a good trial record and was given average ("meets to exceeds expectations") performance reviews. Furthermore, the record reflects she was assigned a mentor after complaining about a lack of assistance. Any lack of mentoring or supervision simply does not rise to the level of an adverse employment action, as she cannot establish the absence had any effect on her employment situation. As for the alleged denial of training, she argues as to being denied training which, by her assessment, "contribute[s] to promotion and pay increases." We have held "an employer's denial of an employee's request for more training is not, without more, an adverse employment action." Box v. Principi, 442 F.3d 692, 697 (8th Cir. 2006) (quoting Griffith v. Des Moines, 387 F.3d 733, 737 (8th Cir. 2004)). In Box, the plaintiff made only one request for additional training and actually received 200 hours of job training for her position. So too here, the record shows Higgins was never actually denied a training opportunity she requested. She testified as to not attending her desired appellate advocacy course because of scheduling difficulties. The

record also shows she attended several other training seminars during her term. Although she makes the bald assertion of being denied training which would have contributed to promotion and pay increases, however, she fails to allege ever being denied a promotion or a raise because of a lack of training. During her twenty-six month tenure at the DSD, her pay increased by more than fourteen percent. As such, her alleged denial of training does not constitute an adverse employment action.

Higgins next contends Kohn kept a "shadow file" about her and started a "whisper campaign of demeaning comments about her performance." Kohn testified she kept files on all of the AUSAs and kept their draft pleadings if she thought they would be beneficial for evaluation purposes. The record does not reflect Higgins was singled out for bad treatment. Even if Higgins could show Kohn only kept a "shadow file" on her, she does not claim the notebook and alleged whisper campaign affected her pay or benefits. She attempts to tie Kohn's whisper campaign to Zuercher's reluctance to accept her in the Pierre office. There is evidence Zuercher was hesitant about Higgins because of discussions he had with employees in the Rapid City office, including Kohn, as to Higgins's trial skills and a magistrate judge's complaints. These were his feelings prior to her assuming the Pierre position. There is no evidence, as Higgins asserts, the "well was poisoned" at her new position. There is no evidence Zuercher would not supervise her or treated her poorly or differently in her new position. Zuercher testified he immediately assigned Higgins a mentor, and was surprised when she resigned. There is also no evidence, aside from her resignation to accept a higher paying position, that she was unhappy in her new position. Because Higgins does not establish she was, in any way, adversely affected by Kohn's record keeping and alleged "whisper campaign," this cannot constitute an adverse employment action.

Higgins next argues Kohn's various complaints about her constitute an adverse employment action. The record provides very limited information about these complaints. Even if there was evidence the complaints were false and retaliatory, Higgins does not allege they led to a material change in her employment status. The record shows no negative consequence to her because of these complaints. As such, they cannot constitute an adverse employment action.

Higgins also claims the DSD's failure to give her a mid-year and annual review in 2001 constitute an adverse employment action. In the DSD, annual progress reports were conducted either in January or February after the year reviewed; mid-year reports appear to be conducted in June. Only the annual reports influence pay increases. It is true Higgins did not receive a mid-year report in June 2001. This was two months before her term was set to expire. This court has often held "[a]n unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." Turner v. Gonzales, 421 F.3d 688, 696 (8th Cir. 2005) (citation omitted). It logically follows that Higgins must show the absence of a mid-year evaluation led to a change in the terms and conditions of her employment. She has not made such a showing. In fact, two months after she was supposed to be evaluated, she was given a new position with the same pay and benefits in Pierre. She did not receive an

annual report in 2001 because she resigned in October-approximately three months before such a review was due.

\*\*\*\*

Finally, Higgins argues her "transfer" to the Pierre office constitutes an adverse employment action. As an initial matter, technically she was not transferred. Her term expired and, in spite of a hiring freeze in place, Tapken sought and was granted permission to offer her a new term position. Should we accept Higgins's characterization of the new position being a transfer, she points to no evidence her title, salary and benefits changed or that her job responsibilities decreased. [Footnote omitted.] See Turner, 421 F.3d at 697 (holding a transfer to a new city is not by itself an adverse employment action where the plaintiff's title, salary and benefits are not affected, and the only adversity the plaintiff can claim are "normal inconveniences associated with any transfer" such as the necessity of "establishing one's professional connections in a new community"); Zhuang v. Datacard Corp., 414 F.3d 849, 854 (8th Cir. 2005) (holding the plaintiff failed to raise a genuine issue of material fact where it was uncontested her pay and benefits remained the same after a change in job responsibilities); Meyers v. Neb. Health & Human Serv., 324 F.3d 655, 660 (8th Cir. 2003) (holding a significant change in working conditions occurs where there is "a considerable downward shift in skill level required to perform [the employee's] new job responsibilities"). In Turner, we ultimately found there was a genuine issue of material fact as to whether the work to which the plaintiff was assigned after her transfer was a considerable downward shift from her responsibilities prior to the transfer. Turner, 421 F.3d at 697. Unlike in Turner, Higgins has failed to present sufficient evidence to raise a genuine issue of material fact as to whether her new position constitutes a demotion. She baldly asserts the Pierre position was "a demotion in substance if not in form" because Zuercher testified it was a "completely different position" and he was, prior to her transfer, hesitant about working with her. What is glaringly absent from her brief is reference to evidence in the record about her job duties in Pierre. The record shows her new position involved prosecuting criminal cases-the same work she was doing in Rapid City. She was immediately assigned a mentor who testified positively about her work. Higgins presents no evidence of being displeased by her workload in Pierre or that it represented a considerable downward shift from her responsibilities prior to the transfer. As such, her "transfer" cannot constitute an adverse employment action.

Higgins contends, even if the alleged actions do not individually constitute an adverse employment action, taken together they cumulatively rise to the level of an adverse employment action. She relies on Phillips v. Collings, 256 F.3d 843 (8th Cir. 2001) and Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997) for the proposition about actions short of termination or a decrease in pay or benefits still constituting an adverse employment action. [Footnote omitted.] In both Phillips and Kim, we found an adverse employment action where the plaintiffs were not fired and did not suffer a change in pay or benefits. Each of these cases presents a particularly extreme set of facts. In Phillips, a supervisor prepared a four-page evaluation of the plaintiff in which she recommended termination

-15-

specifically based, in part, on his religious beliefs. After this negative evaluation was revised by others, the recommendation of "termination" was changed to "needs improvement." In response, the supervisor drafted a new, fifty-three page evaluation criticizing "virtually every aspect of [the plaintiff's] job performance." This evaluation contained an extensive "Corrective Action Plan" which included remedial training. Phillips, 256 F.3d at 846. We concluded this was tantamount to an adverse employment action, noting:

> Indeed the record clearly reveals that [the supervisor], who could not unilaterally terminate [the plaintiff], nor deny his transfer, did everything she could to disrupt his employment. Had [her] corrective action plans been implemented they would signify a tangible change in [the plaintiff's] duties or working conditions that constitute a material disadvantage."

Id. at 849 (internal citations omitted). Likewise, in Kim, immediately after complaining about age and race discrimination, after more than ten exemplary years with the company, the plaintiff was stripped of more desirable foreman duties, was given much lower performance evaluations, was orally warned about his poor "attitude," was placed under constant surveillance at work, was excluded from work meetings, was issued written reprimands for alleged race-based incidents, and was required to attend special retraining in spite of his seniority. We found "[t]hese are the kind of serious employment consequences that adversely affected or undermined Kim's position, even if he was not discharged, demoted or suspended" and held, as a matter of law, such systematic retaliatory conduct collectively constituted an adverse employment action. Kim, 123 F.3d at 1060.

In this case, the record does not show the level of systematic bad treatment adversely affecting Higgins's employment situation which is evident in Phillips and Kim. She was not forced into a remedial retraining program. The alleged "shadow file" apparently had no impact at all on her position, and did not impact her performance evaluations by which the DSD determined her pay. The record contains absolutely no evidence of a "poisoned well" in Pierre. Although there is evidence Zuercher had some hesitancy about supervising Higgins because of complaints about her job performance, there is no evidence these feelings continued after Higgins started working in the Pierre office. Although Kohn's treatment of Higgins was harsh and unprofessional, even cumulatively, the alleged adverse employment actions do not show a material employment disadvantage. Each of the claimed adverse employment actions falls far short of constituting an adverse employment action. Taking these actions together does not correct such insufficiency.

Higgins also contends the district court erred in holding she failed to establish an adverse employment action in her Title VII retaliation claim. Because the district court found her as not having established an adverse employment action in the context of her Title VII race discrimination claim, it assumed she had failed to establish this prong in her Title VII retaliation claim. Higgins argues, in light of the Supreme Court's recent broadening of the

retaliation prima facie case in <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, --- U.S. ----, 126 S.Ct. 2405 (2006) [footnote omitted], she established her prima facie case. We disagree.

As in a Title VII discrimination claim, in a retaliation claim the plaintiff bears the burden of establishing a prima facie case. After <u>Burlington Northern</u>, to establish such a claim, Higgins must show: 1) she engaged in protected conduct; 2) a reasonable employee would have found the challenged retaliatory action materially adverse; and 3) the materially adverse action was causally linked to the protected conduct. <u>Burlington N.</u>, 126 S.Ct. at 2415; <u>cf.</u> <u>Singletary v. Mo. Dept. of Corrs.</u>, 423 F.3d 886, 892 (8th Cir. 2005) (articulating old standard where, to satisfy the second prong, the plaintiff was required to show he suffered an adverse employment action).

Until recently, as part of their prima facie case, we required plaintiffs claiming unlawful retaliation under Title VII-like those claiming unlawful discrimination-to show an "adverse employment action" which produced a "material employment disadvantage" by cutting the employee's pay or benefits, depriving employment opportunities, or affecting future career prospects. Baucom, 428 F.3d at 767. As the standard in both types of Title VII actions was identical, if a plaintiff failed to establish the adverse employment action prong in the discrimination claim, we would automatically find failure to make out the prong in the retaliation claim. See <u>id.</u> at 768 (summarily dispensing with plaintiff's retaliation claim after finding he had failed to demonstrate an adverse employment action in his discrimination claim). In <u>Burlington Northern</u>, the Supreme Court announced a different standard for determining whether a plaintiff has established a retaliation prima facie case. Because "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm," a plaintiff need not show an adverse employment action related to the terms and conditions of employment. <u>Id.</u> at 2414. Instead, "the challenged action [must be] materially adverse, which in th[e] context [of a retaliation claim] means that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Id.</u> at 2415 (citation and internal quotation marks omitted). The standard is thus objective, requiring us to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions. <u>Id.</u> at 2412-13. The Court explained the action against the plaintiff must still be "materially adverse" noting: "[w]e speak of material adversity because we believe it is important to separate significant from trivial harms," <u>Id.</u> at 2415, and "Title VII ... does not set forth 'a general civility code for the American workplace.'" <u>Id.</u> (quoting <u>Oncale v. Sundowner Offshore Servs.</u>, Inc., 523 U.S. 75, 80 (1998)). As such, certain behavior continues to be non-actionable under the retaliation provision such as "petty slights or minor annoyances that often take place at work and that all employees experience," "personality conflicts at work that generate antipathy," and "snubbing by supervisors and co-workers." <u>Burlington N.</u>, 126 S.Ct. at 2415.

The <u>Burlington Northern</u> Court held there was sufficient evidence to support a jury verdict for retaliation where the plaintiff was reassigned to job duties which, although they fit within the same job description as a previous position, were "by all accounts more arduous and

dirtier." Id. at 2417 (quotation marks omitted). Prior to her reassignment, she had been assigned to a forklift operator position which required more qualifications, was more prestigious, and was "objectively considered a better job." Id. The Court concluded a jury could reasonably conclude this reassignment of responsibilities would have been materially adverse to a reasonable employee. Id. The Court also found the plaintiff's thirty-seven day, investigatory suspension with backpay was materially adverse under the new standard. Id.

This is our first opportunity to address Burlington Northern, and apply the Court's reformulation of the retaliation prima facie case. Applying the new standard, we find Higgins has not met her burden. Unlike the plaintiff in Burlington Northern, she has not shown Kohn's retaliatory actions were materially adverse such that a reasonable employee in her situation would have been dissuaded from complaining about discrimination. In her briefs, she essentially confines the arguments to two alleged actions: Kohn's lack of mentoring and supervision and her "transfer" to Pierre. With regard to the mentoring and supervision claim, she contends "floundering should be recognized as an adverse employment action" and argues Kohn's behavior can be compared to "the supervisor who pointedly excludes an employee from networking lunches." Kohn's lack of mentoring or supervision might constitute an adverse employment action under the new standard if Higgins could establish she was actually left to "flounder" or was negatively impacted by the lack of supervision or mentoring. [Footnote omitted.] But she has not alleged, and the record does not support, such a claim. Although the record reflects she had a personality conflict with Kohn, there is nothing to suggest this conflict created a situation so unbearable or bleak that a reasonable employee would have been dissuaded from complaining about discrimination in such an environment.

As for the claim her "transfer" to the Pierre office was a materially adverse action, again it bears mention Higgins was not terminated from her position in Rapid City, nor was she actually transferred to Pierre; Higgins's two-year term position ended by the content of its terms. She was then, after considerable effort by Tapken, offered another two-year term AUSA position in Pierre, which she accepted. It is difficult to characterize this as an adverse action, let alone a materially adverse one. She does not allege the new position was qualitatively more difficult or less desirable than the one she held in Rapid City. As noted above, there is essentially no information in the record about her new position once she moved to the Pierre office. Zuercher testified he was surprised when Higgins resigned. Her mentor, Seiler, testified positively about her performance in Pierre. If anything, the record suggests her situation improved in Pierre. She argues the Pierre job "mandated [her] to leave her case files, start all over with [sic] different cases and move to a new school setting with her family." This court has, prior to Burlington Northern, found such arguments to be wanting. See Turner, 421 F.3d at 697 (holding, where the plaintiff argued a transfer required her to develop new contacts and start her career over, "[w]e are not persuaded as to the normal inconveniences associated with any transfer, such as establishing one's professional connections in a new community, are sufficient, without more, to demonstrate a significant change in working conditions"). Burlington Northern does not change this result. Under

Higgins's logic, any move would qualify as a materially adverse action because it would force an employee to start over in a new city. We are unwilling to set such a definite line. Here, even if we were to accept the premise that her move was a retaliatory action-which we do not-we cannot conclude the move was materially adverse. There is no evidence her new duties were more difficult, less desirable or less prestigious. In this context, even given the inconvenience of a move, this action does not rise to the level of a materially adverse action.

Finally, Higgins points to Ryan's failure to bring a retaliation claim against Kohn as proof Ryan was dissuaded by Kohn's behavior towards Higgins. The standard under <u>Burlington Northern</u> is objective and asks us to consider what a reasonable employee would do in Higgins's shoes. She would like us to look at Ryan's failure to file a complaint against Kohn, and treat her as the proverbial "reasonable employee"-clearly if the EEO contact person would not file a claim, a reasonable employee would likely be dissuaded from filing a claim. We are unwilling to stray from the Supreme Court's objective standard. Furthermore, the record does not support Higgins's contention that Ryan was dissuaded from complaining because of Kohn's treatment of Higgins. Kohn was not Ryan's supervisor, as she was a civil specialist, rather than a criminal one. Therefore, Ryan was unlikely to be dissuaded by Kohn's negative treatment of Higgins because Kohn could not have similarly impacted her career with the D SD. Nevertheless, under <u>Burlington Northern</u>, we must look at Higgins's situation objectively to determine whether a reasonable employee in her shoes would be dissuaded from bringing a complaint. She cannot make her claim based on personality conflicts, bad manners, or petty slights and snubs. It is clear she had a serious personality conflict with her supervisor. The record also shows Kohn was angry with her after she told others Kohn was a racist. What is absent from the record is evidence showing Kohn's anger and related actions materially and adversely affected Higgins's life such that a reasonable employee in her shoes would be dissuaded from complaining.

Given this framework, it is clear that almost all of the events identified by plaintiff as indicating racial animus such as "mandatory" staff meetings, personal use of State owned property on the job, behavior by Anderson's assistant director Edet Frank of Nigerian origin, her being late for the 2001 RSVP training in El Dorado, receipt of personal packages by employees, and interruptions simply do not rise to the level of actionable conduct as explained in the <u>Higgins</u> opinion.

Hence, the Court now addresses the substantive claims alleged by plaintiff – the TEA loan, the events surrounding the complaint made against her by PLC, the OAH loan, and the CLIP bonus.

While plaintiff asserts that not one single Caucasian person has ever been loaned to another agency by DOV, she also acknowledges that there is a practice in DHS, other State agencies and Federal agencies of loaning employees. She admits that she was loaned in the early 1990s, but argues that loan was not due to a racial animus as her supervisor consulted with her, plaintiff took part in the planning of the new position and plaintiff spent a year doing a specific task. In contrast, she asserts that Anderson gave her just one day notice and sent her to the TEA where she was not given a job description or a clear idea of her duties resulting in her being set up for failure.

Even assuming that the job reassignment could be considered an adverse action in light of the Higgins discussion, defendants have provided a legitimate, non-discriminatory reason for the loan that Winston, an African-American female, approached Anderson about loaning one of Winston's employees – Hollaway, a white female – and when Anderson described plaintiff's skills, Anderson and Winston agreed to a two-month loan – later extended for another six months – as approved by the African-American deputy director Williams. "This burden is one of production, not persuasion; it can involve no credibility assessment." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quotation omitted).

The burden then shifts to plaintiff to prove by a preponderance of the evidence that the reason for the loan was pretext for discrimination. The case of Hite v. Vermeer Mfg. Co., 446 F.3d 858, 867 (8th Cir. 2006), provides the following guidance:

"If the employer comes forward with evidence of a legitimate, nondiscriminatory reason for its treatment of the employee, the employee must then point to some evidence that the employer's proffered reason is pretextual." Smith, 302 F.3d at 833. The employee shows pretext by establishing that the employer's "justification for the [adverse action] was unworthy of credence." Id. at 833-34.

An employee can prove pretext in several ways. First, the employee can show that the employer's proffered explanation has no basis in fact. Logan v. Liberty Healthcare Corp.,

416 F.3d 877, 881 (8th Cir. 2005). "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Also, the employee can prove pretext by showing that the employer varied from its normal policy or practice to address the employee's situation. Erickson v. Farmland Indus., Inc., 271 F.3d 718, 727 (8th Cir. 2001). For example, the employee could show that the employer routinely treated similarly situated employees who were not in the protected class more leniently. Smith, 302 F.3d at 835. Likewise, the employee could demonstrate that she was discharged pursuant to an inconsistent policy. Wallace, 415 F.3d at 860.

If the employee presents strong evidence of a prima facie case, then such evidence may establish pretext. Smith, 302 F.3d at 834. In addition, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ⋯ on the issue of whether the defendant's explanation is pretextual.' " Reeves, 530 U.S. at 143, 120 S.Ct. 2097 (quoting Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

See also, Twymon v. Wells Fargo & Co., 462 F.3d 925, 935-936 (8th Cir. 2006):

To prove pretext, a plaintiff must both discredit an employer's asserted reason for termination and show that the circumstances permit drawing the reasonable inference that the real reason for terminating the plaintiff was her race. Johnson v. AT & T Corp., 422 F.3d 756, 763 (8th Cir. 2005).

****

A proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination. See id. at 762 (explaining that the consideration in evaluating pretext is whether the employer honestly believed the employee violated the company's code of conduct, not whether the employer was factually correct in its conclusion). Twymon does not assert that Wells Fargo did not honestly believe she was accountable for violations of the computer policy when they fired her for those violations. Cf. Mershon v. St. Louis Univ., 422 F.3d 1069, 1074-75 (8th Cir. 2006) (explaining that, even assuming the underlying reason for the adverse action was false, the plaintiff failed in rebutting the proffered non-discriminatory reason because he presented no evidence from which to conclude the defendant knew or even suspected its falsity). As such, her assertion of possible access to her computer by other employees does nothing to support her claim of pretext.

Frankly, plaintiff stresses evidence she considers establishing a prima facie case yet has

failed to discuss proof as to why defendants' explanation for the TEA loan was pretextual. She has

failed to rebut that Winston initiated the loan discussion or that Winston and Anderson agreed to the loan with the support of Williams. Moreover, plaintiff has not shown that she was treated differently when the person that was loaned in exchange for plaintiff was white.

The next incident involves the complaints by PLC resulting in her transfer back to DOV and the suspension of plaintiff before her successful grievance. The Court will assume that plaintiff has made a prima facie case even though her grievance appears to have provided her complete relief. Although plaintiff considers the documentation concerning PLC's complaints to defendants about her performance and the subsequent investigation[2] into those complaints by Winston and then Anderson to be hearsay, and chides defendants for failing to provide affidavits of PLC witnesses, the fact remains that all the defendants have to do is provide a legitimate, non-discriminatory reason for their action. The Court notes that while the October 13, 2003 grievance decision was in plaintiff's favor, Roy Hart, the deciding official, stated:

> There is sufficient evidence to suggest that an effective working relationship between the grievant and the staff of Promised Land Church Ministries is likely not possible. Recalling the grievant from this assignment was an appropriate and reasonable action.
>
> As with any new initiative, sometimes roles and responsibilities blur and overlap. Working through these issues takes time, understanding and constant communication. In this case, the circumstances that evolved may have been mitigated of the grievant had a better understanding of the job duties as they specifically applied to her observation role.

---

[2]Selena Ellis concluded that plaintiff "took over" the PLC's Life Skills Class; she "sabotaged" PLC's Life Skills Program; she misrepresented her position as a staff person from the TEA Board by saying that she had been sent by the Governor who wanted a standardized Life Skills program; she told a PLC Life Skills participant that she could cut off her check with one phone call; she stated that she could shut down PLC's ministries with one call; she undermined the authority of PLC staff by openly and continually criticizing the pastor of PLC and the trainer in front of and to the Life Skills' class participants; and she showed disregard for the authority and was discourteous to the Director of First Baptist Arkansas Mentors program.

The burden then shifts to plaintiff to demonstrate that the reason given by defendants – the PLC complaints as investigated – were pretextual. Plaintiff has not shown that the records were not kept in the ordinary course of business and she had the same opportunity to obtain affidavits from PLC personnel if she felt that defendants' records were in error. Again applying the standards set out in Hite and Twymon above, plaintiff has failed to provide evidence of pretext.

Plaintiff claims that her transfer to OAH was made in retaliation for her grievance. Just as with the TEA loan, the Court is not persuaded that the loan to OAH is a materially adverse action as discussed in Higgins since there "is no evidence her new duties were more difficult, less desirable or less prestigious." Id. at *10. Furthermore, the following excerpt from Thompson v. Bi-State Development Agency, 463 F.3d 821, 826 (8th Cir. 2006), highlights whether plaintiff has established the causally linked element of a prima facie case:

> We agree with the district court's observation that the only connection between the lawsuits and the hearing was one of time, and that connection was a weak one. Although we have opined that the "timing of [a] termination can be close enough to establish causation in a prima facie case," Haas v. Kelly Servs., Inc., 409 F.3d 1030, 1037 (8th Cir. 2005), we have repeatedly stated that "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation," Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999); see also Haas, 409 F.3d at 1037. Furthermore, "[o]ur recent cases have, in our view, made clear that a 'mere coincidence of timing' can rarely be sufficient to establish a submissible case of retaliatory discharge." Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002). This case is not, in our opinion, one of those rare cases where the "mere coincidence of timing" establishes a case of retaliation.

In any case, defendants have provided a legitimate, non-discriminatory reason for loaning plaintiff to OAH – that White, an African-American female needed a child maltreatment hearing officer and that plaintiff had a history of working in that area. White's affidavit reflects that she and Anderson discussed plaintiff working as a hearing officer due to the large number of child maltreatment hearing requests, that they believed that plaintiff's prior work would enable her to

conduct such hearings with training which she did receive, and that plaintiff is not the only non-lawyer that works as a hearing officer.

Plaintiff again fails to identify evidence to demonstrate that the reason given by defendants is pretext for retaliation. While she alleges that she was sent there to fail, there is absolutely no evidence that plaintiff has not been able to perform her duties as a hearing officer at OAH.

The final claim is the CLIP bonus in 2004. As defendants have pointed out, plaintiff did not receive a CLIP bonus in 2001, 2002, or 2003 even though she was supervised by a different supervisor for each period. In addition, she has not rebutted that she marked the box that indicated that she had "reviewed the content of this CLIP/PPES with my supervisor and I agree with it." Plaintiff has not shown that she suffered an adverse action, (see, <u>Douglas v. Jackson</u>, 2007 WL 891349, *3 (D. D.C. 2007), for a discussion of discretionary versus automatic bonuses) and she has not presented evidence of a white person receiving dissimilar treatment under similar circumstances.

In sum, plaintiff has failed to establish her claims of race discrimination and retaliation.

Accordingly, defendants' motion (#10) for summary judgment is hereby granted. A separate judgment in favor of defendants will be entered.

IT IS SO ORDERED this 30th day of March, 2007.

George Howard Jr
UNITED STATES DISTRICT JUDGE